# United States Court of Appeals
## For the First Circuit

No. 06-1146

ASOCIACIÓN DE EDUCACIÓN PRIVADA DE PUERTO RICO, INC.;
PUERTO RICO INNOVATIVES EDUCATION SERVICES, INC., d/b/a
COLEGIO TOMÁS ALVA EDISON; CORPORACIÓN EDUCATIVA
RAMÓN BARQUIN, d/b/a AMERICAN MILITARY ACADEMY;
ACADEMIA INMACULADA CONCEPCIÓN-MAYAGÜEZ; SOUTHWESTERN
EDUCATIONAL SOCIETY, INC.; GUAMANÍ SCHOOL, INC.;
COLEGIO ADIANEZ, INC.; ANTILLES MILITARY ACADEMY, INC.;
FUNDACIÓN EDUCATIVA CONCEPCIÓN MARTÍN, INC., d/b/a SONIFEL;
SAINT FRANCIS SCHOOL, INC.; AMERICAN SCHOOL, INC.,

Plaintiffs, Appellees,

ACADEMIA DISCÍPULOS DE CRISTO; ACADEMIA BAUTISTA DE
PUERTO NUEVO; COLEGIO ROSABEL; EPISCOPAL CATHEDRAL SCHOOL;
COLEGIO DE LA VEGA; COLEGIO TITI FE; ESCUELA PRESCOLAR
ELEMENTAL E INTERMEDIA DASKALAS; CAGUAS MILITARY ACADEMY;
COLEGIO RADIANS; FREDERICK FROBEL BILINGUAL SCHOOL;
COLEGIO KIANY; FAJARDO ACADEMY,

Plaintiffs, Appellants,

v.

ALEJANDRO GARCÍA-PADILLA, Secretary of the Department of
Consumer Affairs of the Commonwealth of Puerto Rico,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

Salvador J. Antonetti-Stutts, Solicitor General, with whom Mariana D. Negrón-Vargas, Deputy Solicitor General, and Irene S. Soroeta-Kodesh, Assistant Solicitor General, were on brief, for appellant.

Antonio J. Amadeo-Murga, for appellees.

Alexander E. Dreier, with whom H. Christopher Bartolomucci, Sarah M. Berger, Hogan & Hartson L.L.P., Debra P. Wilson, Legal Counsel, National Association of Independent Schools, on brief, as amici curiae for the National Association of Independent Schools and the Council for American Private Education.

_____

April 11, 2007

_____

**TORRUELLA**, **Circuit Judge**.  This appeal is the second trip to this Court for the parties to this litigation.  The parties' dispute began when Asociación de Educación Privada de Puerto Rico, Inc., a nonprofit private association representing the interests of private primary, secondary, and post-secondary member schools in Puerto Rico, together with certain individual schools (together, the "private schools"), filed a complaint against the Secretary of the Department of Consumer Affairs of Puerto Rico ("DACO").  The complaint alleged that DACO's Rule 11 of Regulation 6458, entitled "Regulation for the Disclosure of Information on the Sale and Distribution of Textbooks" ("Reglamento para la Divulgación de Información en la Venta y Distribución de Libros de Texto"), violates the private schools' First Amendment rights to free speech and academic freedom.  The private schools sought a declaration to that effect and injunctive relief.  The district court dismissed the private schools' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted.  We reversed that dismissal and remanded the case, explaining that the district court had insufficient facts about Regulation 6458's implementation and the resulting burdens and benefits to decide that the private schools had stated no legally sufficient claims.

On remand, the district court entered an initial scheduling order asking the parties to submit pretrial briefs

-3-

addressing which First Amendment rights are implicated by Rule 11 of Regulation 6458, the nature and weight of the burdens imposed on the private schools, and the strength of the government's justifications for imposing the burdens. The private schools subsequently amended their complaint to add a cause of action alleging that the Commonwealth of Puerto Rico's Law 116 of May 18, 2004 ("Law 116"), entitled "Law for the Acquisition of School Textbooks" ("Ley para la Compra de Libros de Textos Escolares"), also violated the private schools' rights to academic freedom and free speech. The private schools again sought a declaratory judgment and injunctive relief, as well as costs and attorneys' fees.

After a one-day trial, the district court found that Rule 11 of Regulation 6458 and Law 116 violated the private schools' rights under the First Amendment, holding that neither provision was narrowly tailored to further Puerto Rico's legitimate state interests. The Secretary of DACO appealed that ruling. After careful consideration, we affirm the district court's judgment as to Law 116, reverse its decision as to Rule 11, and remand with instructions to modify the permanent injunction to enjoin only that portion of Rule 11 that violates the private schools' right to academic freedom.

## I.  Background

Even though Puerto Rico law makes Puerto Rico's Secretary of Education responsible for "establish[ing] the standards and the requirements that shall be met by the educational institutions that request a license,"[1] P.R. Laws Ann. tit. 18, § 2113, DACO's Secretary has also asserted authority over the regulation of private schools.  On May 1, 2002, DACO promulgated Regulation 6458 with the stated purpose of "protecting Puerto Rican famil[ies] and parents, and/or tutors who register their minor children and/or wards in the private schools of Puerto Rico."  Reg. 6458, R.2. Regulation 6458 was also expressly intended "to define the obligations and responsibilities of schools, bookstores, distributors, and publishing houses in relation to the corresponding processes pertaining to the sale of textbooks."  Id.

---

[1]  The private schools of Puerto Rico are required by statute to operate under a license.  P.R. Laws Ann. tit. 18, § 2111.  The Secretary of Education's power to regulate schools is subject to a proviso protecting the schools' authority to develop their academic programs.  P.R. Laws Ann. tit. 18, § 2117 ("The license to be issued by the Secretary by virtue of this subchapter will be institutional in nature and shall include the authorization to issue diplomas, certificates or degrees up to the maximum academic level established in the license.  Provided, [t]hat a private educational institution, by virtue of the license issued, and pursuant to academic autonomy this chapter provides, protects and fosters, may establish new academic programs, additional courses or any other academic measure, provided the same does not exceed the maximum academic level authorized by the license, nor modifies its institutional objectives or mission.").

Regulation 6458 imposes several obligations on the private schools. Rule 8 of the regulation directs schools to post on school grounds, by May 15 of the every year, a list of books to be used the following school year. Id. at R.8(A), (B). Under this rule, private schools must also provide DACO and the parents with the list of books, which must include "a briefing on the book, its title, author, publishing house, edition, and publishing year." Id. at R.8(C), (D). Rule 9 instructs private schools to disclose to DACO and parents final textbook prices and any agreement the schools have reached with a book seller. Id. at R.9(A). The schools must disclose on the same notice that "said agreement or contract will in no way infringe on the parents' right to buy the books in other bookstores, and/or via other distributors or publishing houses." Id. at R.9(B). Moreover, "[t]he school must place the booklist, including a full review, the title of the book, author, publishing house, edition, publication year, and the final sale price in a highly-conspicuous bulletin board." Id. at R.9(D). Rule 10 requires private schools to inform parents of price changes. Id. at R.10. Rule 11, the specific provision challenged by the private schools, provides:

> In the case which [sic] there are changes in the edition, the school will inform [sic] in the book list which of these books have different editions, what the change specifically consists of, and whether it is a significant change or not, as defined by these regulations. In case that the changes are not significant, the school has to inform the

> parents on said list, that they have the option of buying the previous edition.

Id. at R.11. Rule 12 requires schools to disclose to parents the existence and applicability of Regulation 6458. Id. at R.12. Schools must post a notice, in a sign not smaller than eight and a half inches by eleven inches, with a letter size not smaller than twenty-two points, not more than five feet away from a place to which parents can have visual access, and between five and six feet from the ground, containing the following language:

> This school has the obligation to inform parents the pertinent process for book sale and distribution in accordance with the Regulations for the Release of Information About the Sale and Distribution of Textbooks of DACO. A copy of these regulations is available in our library. Not complying with the rules set forth in said regulations could lead to the levying of administrative fines in accordance with the DACO Organic Law.

Id. Failure to comply with Regulation 6458 may result in the imposition of fines of up to $10,000.[2] Id. at R.18.

On May 18, 2004, Law 116 was enacted with the stated purpose of "providing that all private schools authorized to operate in the Commonwealth of Puerto Rico must count with the consent of the Association, Council of Teachers and Parents to

---

[2] By contrast, Puerto Rico's Education Code provides that "[a]ny natural or juridical person who operates a private educational institution as defined in this subchapter without the proper license provided therein shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished with a fine not to exceed five hundred (500) dollars." P.R. Laws Ann. tit. 18, § 2124.

determine the maximum budget applicable to each grade for the acquisition of textbooks required in each school year." Law 116, preamble. Law 116 establishes that

> [e]very private school accredited by the General Council of Education that requires the acquisition of school textbooks to their students shall have the consent of [an association or council of parents and teachers of children in that private school] to determine the maximum budget applicable for each school grade for the acquisition of said books required in each school year.

Law 116, Art. 3.

Both Law 116 and Regulation 6458 define the relevant books broadly. Under Law 116, "school textbook" means "every text, dictionary, reference textbooks [sic], handbook, pamphlet, or material for study required or suggested by any private school for use of the academic or curricular program." Id. at Art. 2(c). Regulation 6458 defines "book" to mean "all textbooks, dictionaries, reference books, handbooks, pamphlets, or study materials required or suggested by a school for the use of their academic programs and/or curricula." Reg. 6458 at R.4(H).

On remand, the district court made the following findings of fact regarding the implementation of Regulation 6458 and Law 116.

Textbooks are pedagogical tools used on a daily basis to teach substantive information.[3] They are also used by teachers and school administrators to develop curricula and lesson plans. Textbooks are widely used in private primary and secondary schools in Puerto Rico.

Private schools choose textbooks that are consistent with their particular academic and educational vision, mission, philosophy, curriculum, and methodology, all of which vary significantly among Puerto Rican private schools. In choosing textbooks, private schools also consider significant developments in an educational field, the introduction of a new pedagogical approach, and the availability of the new edition as opposed to the old edition of a particular textbook. Secondarily, the schools also take into account the price and availability of textbooks.

The textbook selection process is school-specific. In general, private schools will first evaluate a new edition or series for whether the textbook is aligned with the school's curriculum, mission, vision, philosophy, and methodology, and whether it meets the students' needs. Teachers often make

---

[3] Textbooks comprise more than their bound volumes alone. Textbooks are often accompanied by resource kits, which include audio and visual multimedia materials such as audio cassettes, CD-ROMs, DVDs, floppy disks, and transparencies. Moreover, textbooks are frequently accompanied by related workbooks, which are usually textbook-edition-specific. These workbooks are often used for lesson enforcement, preparation, or extra practice in correlation with a specific in-class lesson.

independent evaluations of textbook series or editions based on the above-mentioned criteria. After an initial independent evaluation by individual teachers, the teachers often meet as a group on multiple occasions to determine whether the series or edition meets the criteria. Teachers then share their input with school administrators, who review the teachers' conclusions, sometimes making their own independent assessment of the textbooks. Teachers' input in this process is highly valued by the schools.

Some private schools retain external consultants with expertise in certain substantive areas to advise teachers or administrators about new textbooks or pedagogical methods. Parental participation in selecting textbooks in private schools is typically minimal or nonexistent. At some private schools, parents act as a general sounding board or advisory group, but the ultimate decision of which books are selected resides with the private schools.

Private schools do not generally change the editions or series of textbooks for all subject areas at once. For instance, one Puerto Rican private school evaluates the textbooks at the rate of approximately two subjects per year.

Publishing houses inform private schools about their new textbook series or editions through conferences, telephone calls, and direct mailings of brochures, sample textbooks, and educational kits. Textbook publishers change the edition of a textbook every

two to six years. Certain substantive areas are apt to change more frequently than others. For instance, new editions of science textbooks may be introduced by publishers every two to three years, while English textbook editions usually change only every five or six years. Notice of new textbook editions varies generally from one year to a couple of months before a new academic year.

After choosing textbooks to be used in the upcoming academic year, private schools create a list of the books selected. Consistent with Rule 8 of Regulation 6458, the schools provide parents with that list no later than May 15th of the previous academic year.

The use of two different textbooks to teach a class has in the past resulted in disruption in the classroom. In the 2004-05 academic year, a ninth grade Social Studies teacher at Tomás Alva Edison School, a private secular school in Caguas, Puerto Rico serving 700 students, decided not to require students to buy the new edition of their Social Studies textbook because the teacher and the school believed that the old textbook edition was acceptable and the changes between the old and new edition were not significant. Because the old textbook edition was out of print, some students were unable to find it and had to buy the new edition. Consequently, both editions of the textbooks were used in the same classroom.

The two editions were paginated differently, which, according to the teacher, created disruption and classroom management problems. Moreover, the teacher was forced to use cooperative groups to teach some lessons even though the teacher and school administrators did not think this teaching method was appropriate for the subject matter.

Ana Christina Sánchez, the school director of Colegio Adianez, a private secular primary and secondary school with 780 students in Guaynabo, Puerto Rico and the president of the private schools association also had an experience teaching with two different textbook editions before the promulgation of Regulation 6458. Although Sánchez did not think that the changes between the editions were significant, she found that having two editions of the same textbook was disruptive in the classroom, primarily because the same material appeared on different pages. She stated that it was difficult to maintain the students' attention and that a classroom-management problem developed. After a few weeks, she required all the children to purchase and use only the new edition of the textbook.

## II.  Standard of Review

We review a grant of permanent injunctive relief for abuse of discretion. See A.W. Chesterton Co., Inc. v. Chesterton, 128 F.3d 1, 5 (1st Cir. 1997). We review a district court's findings of fact for clear error. See Aponte v. Calderón, 284 F.3d

-12-

184, 191 (1st Cir. 2002).  Questions of law are reviewed <u>de novo</u>.

See <u>id.</u>

### III.  Discussion

The standard for issuing a permanent injunction requires the district court to find that (1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction.  <u>A.W. Chesterton Co., Inc.</u>, 128 F.3d at 5.

#### 1. Success on the Merits

The private schools maintain, and the district court held, that Rule 11 of Regulation 6458 and Law 116 violate their right to academic freedom under the First Amendment.  The private schools argue that by preventing them from selecting and requiring textbooks of their choice, Rule 11 of Regulation 6458 and Law 116 infringe on their constitutional right to determine for themselves, as educational institutions, what to teach and how to teach it.

The Supreme Court has recognized that "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendental value to all of us."  <u>Keyishian</u> v. <u>Bd. of Regents of Univ. of State of N.Y.</u>, 385 U.S. 589, 603 (1967). "Academic freedom, though not a specifically enumerated constitutional right,

-13-

long has been viewed as a special concern of the First Amendment." Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 312 (1978). The right to academic freedom "establish[es] a zone of First Amendment protection for the educational process itself, which, in proper circumstances, must include not only students and teachers, but their host institutions as well." Cuesnongle v. Ramos, 713 F.2d 881, 884 (1st Cir. 1983).

In the 1950s, the Supreme Court defined the right to academic freedom in a series of decisions limiting the reach of state laws that required publicly employed teachers to take loyalty oaths. In these opinions, the Court invoked academic freedom to protect universities, as academic institutions, against government control.

The concern that schools require protection from government interference first appeared in Justice Frankfurter's concurring opinion in Weirman v. Updergraff, 344 U.S. 183 (1952). The Court in Weirman held that an Oklahoma statute requiring that state employees take an oath denying past and present affiliation with certain "subversive" groups violated the appellants' right to due process. Id. at 191-92. In his concurrence, Justice Frankfurter warned of the "unwarranted inhibition upon the free spirit of teachers," as it would result in "caution and timidity." Id. at 195 (Frankfurter, J., concurring in the judgment). He wrote that "teachers -- in our entire educational system, from the

<u>primary grades to the university</u> -- . . . cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them." <u>Id.</u> at 196 (emphasis added). Thus, "[t]he functions of educational institutions in our national life and the conditions under which alone they can adequately perform them are at the basis of . . . limitations upon State and national power." <u>Id.</u> at 197.

Five years later, the Court explicitly articulated a theory of constitutional protection for academic freedom in <u>Sweezy</u> v. <u>New Hampshire</u>, 354 U.S. 234 (1957). A plurality of the Court held that a college professor's contempt conviction -- for refusing to answer the state government's questions about the content of his lectures and his knowledge of the Communist party -- violated the professor's right to free speech and academic freedom. <u>See</u> <u>id.</u> at 250. Although the plurality opinion ultimately decided the case on due process grounds, it addressed the role of academic freedom:

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to

> evaluate, to gain new maturity and
> understanding; otherwise our civilization will
> stagnate and die.

Id.; see also Urofsky v. Gillmore, 216 F.3d 401, 413 (4th Cir. 2000) ("[In Sweezy,] six justices agreed that the First Amendment protects values of academic freedom.").

In his Sweezy concurrence, Justice Frankfurter, who along with Justice Harlan provided the votes necessary to reverse, relied exclusively on academic freedom as protected by the First Amendment to find the professor's conviction unconstitutional. Id. at 266 (Frankfurter, J., concurring in the result). Warning that "governmental intrusion into the intellectual life of a university" creates a "grave harm," Id. at 261, Justice Frankfurter went on to articulate an institutional right to academic freedom:

> It is the business of a university to provide
> that atmosphere which is most conducive to
> speculation, experiment and creation. It is
> an atmosphere in which there prevail the four
> essential freedoms of a university -- to
> determine for itself on academic grounds who
> may teach, what may be taught, how it shall be
> taught, and who may be admitted to study.

Id. at 263 (internal quotation marks omitted).[4]

---

[4]  Justice Frankfurter's articulation of academic freedom as institutional autonomy was later adopted by Justice Powell in his separate yet controlling opinion in Bakke. 438 U.S. at 312. Justice Powell held that even though the Fourteenth Amendment and Title VI prohibited a state from penalizing an applicant on the basis of race, the First Amendment right to academic freedom empowered a state university to take race into account in admitting students when doing so in pursuit of the academic goal of a diverse student body. Id. at 311-19. Justice Powell relied on the fourth of Justice Frankfurter's "four essential freedoms" -- the right of

Three years later, the Court again invoked academic freedom to strike down an Arkansas statute compelling teachers to list every organization to which they had belonged in the last five years.  Shelton v. Tucker, 364 U.S. 479 (1960).  The Shelton court's decision reiterated the judiciary's willingness to protect academic freedom and expanded its purview to secondary schools, holding that "[t]he vigilant protection of constitutional freedoms [of speech, inquiry and association] is nowhere more vital than in the community of American schools."[5]  Id. at 487.

_____

a university to determine for itself on academic grounds who may be admitted to study.  Id. at 312.  Justice Powell's academic freedom rationale was later endorsed by a majority of the Supreme Court in Grutter v. Bollinger, 539 U.S. 306, 325 (2003).

[5]  Although Shelton was the first case in which the Supreme Court explicitly applied the protection of academic freedom in the secondary education context, traces of the Court's willingness to protect the rights of primary and secondary schools to teach as they please existed as early as 1923.  In Meyer v. Nebraska, the Supreme Court declared a state law prohibiting the teaching of foreign languages in private and public schools unconstitutional because no legitimate state interest justified the regulation that "attempted materially to interfere with the calling of modern language teachers, with the opportunities of pupils to acquire knowledge, and with the power of parents to control the education of their own."  262 U.S. 390, 401-03 (1923).

Two years later, the Supreme Court struck down a state statute requiring all children between the ages of eight and sixteen years to attend public school as unconstitutional noting that "[private schools] are engaged in a kind of undertaking not inherently harmful, but long regarded as useful and meritorious.  Certainly there is nothing in the present records to indicate that they have failed to discharge their obligations to patrons, students, or the state."  See Pierce v. Soc. of the Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 534-36 (1925).

Finally, in Farrington v. Tokushige, the Supreme Court

In view of this history, we find that the private schools have a First Amendment right to academic freedom. By the same token, we also acknowledge the right and power of the state to promulgate reasonable regulations affecting private primary and secondary schools to ensure that minimum educational standards are met.[6]  See Pierce, 268 U.S. at 534 ("No question is raised

addressed the constitutionality of a Hawaii statute heavily regulating private schools.  273 U.S. 284 (1927).  The Court held that the statute went "far beyond mere regulation of privately supported schools" because it "[gave] affirmative direction concerning the intimate and essential details of such schools, intrust[ed] their control to public officers, and den[ied] both owners and patrons reasonable choice and discretion in respect of teachers, curriculum and text-books." Id. at 297 (emphasis added).

Although Meyer, Pierce, and Tokushige were decided on due process grounds, Meyer, 262 U.S. at 401-03; Pierce, 268 U.S. at 534-35; Tokushige, 273 U.S. at 298-99, each was decided in the 1920s, before the Bill of Rights was incorporated into the Fourteenth Amendment.  Thus, although they do not expressly address a right to academic freedom, these cases stand for the proposition that "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." Griswold v. Connecticut, 381 U.S. 479, 482 (1965); see also Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525, 533 n.5 (1st Cir. 1995)(noting that Meyer and Pierce would probably be decided today on First Amendment grounds).

[6]  There is no doubt of a state's heightened interest in regulating primary and secondary schools.  See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 864 (1982) (noting that states have broad discretion in the management of secondary education because secondary schools "are vitally important in the preparation of individuals for preparation as citizens and as vehicles for inculcating fundamental values necessary to the maintenance of a democratic political system") (quotation marks omitted)). As such, the right to academic freedom in secondary education is necessarily more circumscribed than that of a university.  However, we need not demarcate the precise boundaries of academic freedom in primary and secondary schools here.  Suffice it to say that in this case, the regulation of

-18-

concerning the power of the state reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils . . . ."); Board of Ed. of Central Dist. No. 1 v. Allen, 392 U.S. 236, 246 (1968)("[A] substantial body of case law has confirmed the power of the States to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction."). Still, "the discretion of the States and local school boards must be exercised in a manner that comports with the transcendental imperatives of the First Amendment." Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 864 (1982). Mindful of this balancing requirement, we examine the constitutionality of Regulation 6458 and Law 116.

The private schools claim that both Rule 11 of Regulation 6458 and Law 116 violate their right to academic freedom because they interfere with their right to determine "what may be taught" and "how it shall be taught," delegating those determinations to

---

textbooks implicates academic freedom sufficiently to require the state to demonstrate that the regulation withstands constitutional scrutiny.

the state government and to parents.[7]  We analyze each provision in turn.

## A. Regulation 6458

Regulation 6458 requires the private schools to announce what books will be used in a school year, Reg. 6458, R.8, to disclose the book prices and any agreements they may have with book sellers, id. at R.9, to inform parents of any price changes, id. at R.10, and to disclose to parents the existence and applicability of Regulation 6458.  Id. at R.9.  Regulation 6458 also requires that

> [i]n the case which [sic] there are changes in the edition, the school will inform in the book list which of these books have different editions, what the change specifically consists of, and whether it is a significant change or not, as defined by these regulations.  In case that the changes are not significant, the school has to inform the parents on [sic] said list, that they have the option of buying the previous edition.

Id. at R.11.

Under Regulation 6458, significant changes are "historical, technological, scientific and/or cultural changes integrated in the new edition of a book that are significant and as

---

[7]  Law 116 provides the authority of the "Association or Council of Parents" in each private school to approve or reject a private school's proposed textbook budget.  As such, the Association's members' acts are performed under color of state law, thus constituting acts of the state within the meaning of the Fourteenth Amendment.  See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 68 (1963)(finding that acts and practices of a commission created to "encourage morality in youth" were "performed under color of state law" and thus were state action).

such cause the total or partial revision of one or several chapters or sections and/or the inclusion of one or several chapters or sections." Id. at R.4(A). However,

> [t]he exclusion of chapters or sections, cosmetic changes and/or style, such as cover changes, chapter or section order, book texture and/or material does not constitute a significant change. Additions of one or several sentences to one chapter or section or through a new book edition will not be considered a significant change nor the addition of one or several drawings, graphics, tables, or photos.

Id. Regulation 6458 does not set forth a procedure for resolving disputes between DACO and a private school over what may be considered a "significant change."[8]

The district court held that "Rule 11 of Regulation 6458 imposes restraints on [the private schools'] First Amendment rights of free speech and, even more pointedly, academic freedom." Asociación de Educación Privada de Puerto Rico, Inc. v. García Padilla, 408 F. Supp. 2d 62, 71 (D.P.R. 2005). We agree.

Rule 11 of Regulation 6458 interferes with the private schools' decisions regarding what may be taught and how it may be

---

[8] According to trial testimony, at one point, DACO had contacted the Puerto Rico Department of Education regarding the formation of a panel to provide the Secretary of DACO with information about what constitutes a "significant change" in diverse educational subject areas. However, this effort ceased after the change in administrations. There is no indication that the institution of such a panel will be pursued in the future, nor is it clear that the establishment of such a panel would be dispositive of the issues raised by this case.

taught.  See Sweezy, 354 U.S. at 263 (Frankfurter, J., concurring in the result).  Textbooks are pedagogical tools essential not only to the teaching of substantive information, but also to the development of effective curricula and lesson plans.  García Padilla, 408 F. Supp. 2d at 65-66.

> Teachers at private schools rely heavily on textbooks to create their individualized course syllabi and daily lesson plans. Teachers also rely on textbooks to prepare student assessments, such as examinations. Textbooks are employed as the primary method to convey the substantive content of lessons to students and to impart or strengthen new skills.  Textbooks are widely used in the classroom, as well as for student extra practice, lesson preparation or review, assessment preparation, remediation, enrichment, and homework assignments.

Id. at 71-72.

A school's selection of textbooks is thus closely tied to its First Amendment right to expression.  If most of the instruction presented to students comes from textbooks, the knowledge students glean from those textbooks significantly influences their understanding of and perspectives on particular subjects.  See M. David Bieber, Textbook Adoption Laws, Precensorship, and the First Amendment: The Case Against Statewide Selection of Classroom Materials, 17 J. Marshall L. Rev. 167, 167 (1984) (arguing that state textbook adoption laws have been manipulated "to accomplish ideological suppression" and proposing that states "return control of textbook selection to local school

-22-

boards"). This is especially important in subjects dominated by diverging viewpoints, discussion, and debate, where it is impossible to separate factual from ideological content. See id.; Martin H. Redish & Kevin Finnerty, What Did You Learn in School Today? Free Speech, Values Inculcation, and the Democratic-Educational Paradox, 88 Cornell L. Rev. 62, 111 (2002) (arguing that state control over the public educational process, for example in the selection of textbooks, threatens First Amendment values). Accordingly, the selection of textbooks is an important pedagogical decision because the chosen textbook often represents the student's only source of understanding of these subjects. See Redish & Finnerty, supra ("By selecting history texts, a school ingrains in its students a particular understanding of American history, and the likelihood that they will be exposed to contrary perspectives is relatively minimal.").

Rule 11 interferes with "what may be taught" in private schools. Sweezy, 354 U.S. at 263 (Frankfurter, J., concurring in the result). Rule 11 dictates that if DACO determines that changes between textbook editions are not significant, a school cannot require parents to buy the newer edition. The rule thus forces schools to teach using different textbook editions with differing content. In fact, Regulation 6458's definition of "significant change" virtually ensures that the private schools will have to allow its students to use textbooks with content the schools do not

approve of, either because it includes information that the schools do not wish to teach or because it lacks information the schools would like to teach. For example, a private school may find the inclusion of new photographs and diagrams in a science textbook particularly helpful in teaching a particular concept, and yet Rule 11 of Regulation 6458, by its very terms, would prevent the private school from requiring its students to purchase that textbook because under Regulation 6458, the addition of drawings, graphics, tables, photographs does not constitute a significant change between textbook editions. See Reg. 6458, R.4(A).

More alarmingly, Regulation 6458 may force schools to teach using books that contain information directly in conflict with its particular philosophy, methodology, or mission. Regulation 6458 provides that a "significant change" is a "historical, technological, scientific and/or cultural change[] . . . [that] cause[s] the total or partial revision of one or several chapters or sections and/or the inclusion of one or several chapters or sections," but not "[t]he exclusion of chapters or sections" or "additions of one or several sentences to one chapter or section or through a new book edition." Id. But the exclusion or inclusion of even one sentence or phrase may very well be considered a significant change by a private school for either teaching purposes or in light of the school's academic philosophy or mission. In fact, seemingly minor changes in text may be

precisely what makes a book's new edition acceptable to a school and consistent with the message the school wishes to convey.  For example, a book may become acceptable by virtue of the omission in a later edition of language found in prior editions.  <u>Compare</u> Thomas A. Bailey, <u>The American Pageant: A History of the Republic</u> 579 (5th ed. 1975) (describing Jews as "nerve racked [sic]"); <u>id.</u> at 6 (referring to Native Americans as "near-naked natives"); <u>id.</u> at 55 (referring to a woman fighting back "with all the fury of a woman scorned") <u>with</u> Thomas A. Bailey, <u>The American Pageant: A History of the Republic</u> (10th ed. 1994) (omitting these phrases). Similarly, the inclusion or exclusion of even two words, such as "intelligent design" in a new edition of a science textbook may substantially burden the schools' ability to convey deeply held values to their students.  As the district court noted,

> The addition or exclusion of a sentence in a new edition of a textbook stating that, 'Evolutionary theory should be critically evaluated against other origin theories,' could be imperative to a given private school's academic philosophy.  A private school, religious or secular, that supports teaching creationism or alternative origin theories might find that the evolution disclaimer is necessary to achieve that end. Conversely, a private school who wishes to exclusively teach evolution theory might find that the inclusion of a[n] evolution disclaimer undermines the school's philosophy, and conclude that they want to adopt the new edition of a textbook that has excluded the disclaimer.

García Padilla, 408 F. Supp. 2d at 73.[9]

By imposing restrictions on when a private school may require its students to use a particular book, Rule 11 also interferes with the private school's freedom to determine how it teaches. Under Rule 11, once the Secretary deems a change insignificant, a private school must be prepared to teach two editions of a textbook, regardless of whether this contravenes the private school's chosen teaching method. As the district court found,

> [r]equiring the use of two textbook editions will be highly burdensome to private schools and their teachers who will have to draft two different sets of lesson plans for each course; contend with resultant case management problems and disruptions; and employ teaching methods that the schools and teachers do not find effective or do not want to utilize.

Id. at 72.

---

[9] It should also be noted that by allowing parents to purchase the old edition of a textbook when DACO determines that a change is insignificant, DACO in effect imposes a disincentive for schools to choose new editions. Faced with the prospect of having to teach out of two different books, or worse yet, of having to litigate what constitutes a "significant" change, teachers may well decide to keep the old version (if they can find enough copies) rather that choosing the new one for pedagogical reasons. See Crowley v. McKinney, 400 F.3d 965, 969 (7th Cir. 2005) (noting that litigation over the correctness of a school's decisions "would be bound to interfere with the educational mission. . . . not only by increasing schools' legal fees but also and more ominously by making school administrators and teachers timid because [they are] fearful of being entangled in suits by wrathful parents rebuffed in their efforts to superintend their children's education").

By way of example, the district court credited the testimony of a private school Social Studies teacher who decided to teach using an old textbook edition, rather than the new one, because she did not consider the changes to be significant. Id. at 67. However, because the old edition was out of print, some students were unable to find the old edition and had to use the new one. Id. The teacher testified that using the two editions created disruption in the classroom and classroom-management problems. Id. Moreover, because of the shortage of old editions, the teacher was sometimes forced to use cooperative groups for the lessons, even though the teacher and school administration did not think that the subject matter should be taught in such a manner. Id. This example illustrates how restricting the private school's ability to require one book for all students may very well result in the infringement of a school's chosen teaching methodology.[10]

---

[10] This problem is exacerbated by DACO's questionable competence in the area it seeks to regulate. Given DACO's general mandate to "defend and implement the rights of the consumer, to restrain the inflationary trends; as well as the establishment and inspection of a price control over the goods and services for use and consumption," P.R. Laws Ann. tit. 3, § 341b, we express serious doubts as to its institutional competence to regulate academia effectively, mindful of the complexity inherent in that endeavor. See Cuesnongle, 713 F.2d at 886 ("The constitutional issue, of course, is not the simple one of whether DACO was wrong, but the larger one of whether and to what extent a university, engaged in the highly important and complex enterprise of teaching, should properly be subject to state regulation by an administrative body established to protect consumers from defective products . . . ."). As the district court noted, "private schools are better qualified to determine whether a change in an edition is significant because, unlike DACO, the private schools have expertise in pedagogical

Thus, Rule 11 interferes with autonomous decisionmaking by private schools and intrudes upon their freedom to pursue their academic objectives without interference from the government.

Although Rule 11 of Regulation 6458 impairs private schools' First Amendment right to academic freedom, it may nonetheless be valid if it survives constitutional scrutiny. "Because academic freedom rights must ultimately flow from the First Amendment, claims of their violations are subject to all the usual tests that apply to assertions of First Amendment rights." Omosegbon v. Wells, 335 F.3d 668, 676-77 (7th Cir. 2003). In this case, Rule 11 of Regulation 6458 directly infringes on the private schools' ability to communicate information to their students, and as such, we will analyze the regulation as an infringement on the schools' speech. Thus, in determining whether Rule 11 violates the First Amendment, we look first to whether it is content-neutral, because no matter how valid a government's interest in regulating,

---

methods and the substantive academic fields under review, and are well acquainted with their institution's unique educational mission, philosophy, and methodology." García Padilla, 408 F. Supp. 2d at 77.

The concern regarding institutional competence in government interference with academia is supported by the judiciary's longstanding reluctance to meddle with the discretion of academics, either on substantive or procedural grounds, when they make bona fide academic decisions. See Regents of the University of Michigan v. Ewing, 474 U.S. at 226 ("[Courts have a reluctance] to trench on the prerogatives of state and local educational institutions and [a] responsibility to safeguard their academic freedom, a special concern of the First Amendment." (internal quotation marks omitted)).

it generally cannot be pursued by discriminating between particular viewpoints or subject matters. See Simon & Schuster, Inc. v. Members of N.Y. State Criminal Victims Bd., 502 U.S. 105, 115 (1991). "Government action that stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government, contravenes the [right to free speech]." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641 (1994). Thus, regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content are subject to strict scrutiny. See id. at 642.

By contrast, regulations intended to serve purposes unrelated to content of the regulated speech, despite their incidental effects on speech, expression, or message are subject to intermediate scrutiny. Simon & Schuster, Inc., 502 U.S. at 122 n.*. The "government may impose reasonable restrictions on the time, place, or manner of protected speech provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication.'" Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton, 536 U.S. 150, 175 (2002) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). Under intermediate scrutiny, restrictions imposed by a statute need not be the least restrictive or least intrusive means

of accomplishing the statute's legitimate governmental interest. See Ward, 491 U.S. at 798-99. Rather, narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively without it, id. at 799, or if "the means chosen are not substantially broader than necessary to achieve the government's interest." Id. at 800.

"The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." Id. at 791. Ordinarily, laws that distinguish favored speech from disfavored speech based on the ideas expressed are content-based. Turner Broad. Sys., Inc., 512 U.S. at 643 (citing Burson v. Freeman, 504 U.S. 191, 197 (1992); Boos v. Barry, 485 U.S. 312, 318-19 (1988)). "By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." Turner Broad. Sys., Inc., 516 U.S. at 643 (citing Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804 (1984); Heffron v. International Soc. For Krishna Consciousness, Inc., 452 U.S. 640, 649 (1989)).

We see no hint of bias or censorship in DACO's regulation of the private schools' choice of textbooks. We note that in promulgating Regulation 6458, DACO was not motivated by hostility

to particular ideas, opinions, or educational philosophies, nor was DACO concerned with harms that might occur from students' exposure to particular information. DACO's interest in adopting Regulation 6458 was to ensure that consumers had sufficient information about textbooks -- whatever the message in the textbook itself -- to make an informed decision about the cost of education in private schools and to protect consumers against harms resulting from "arbitrary or abusive use of new editions of textbooks that merely contain cosmetic changes," harms that would arise independent of any message or teaching that might or might not be adopted by the private schools. On its face, therefore, Regulation 6458, including Rule 11, is content-neutral, censoring no subject, opinion, or educational philosophy. Thus, we apply intermediate scrutiny to determine whether the government's interest is substantial and whether the effect of the statute on speech and academic freedom is no greater than necessary to protect DACO's interest.

DACO's primary goal in promulgating Regulation 6458 is "to provide consumers with the information regarding the [sic] textbooks in order for them to be able to make an informed decision about the cost of education in private schools." Appellant Br. at 50. We agree with the district court that this is a significant governmental interest. However, "[t]hat the Government's asserted interests are important in the abstract does not mean . . . that the [speech regulation] will in fact advance those interests."

-31-

<u>Turner Broad. Sys. Inc.</u>, 512 U.S. at 664. We must inquire whether the restrictions imposed by Regulation 6458 are narrowly tailored to further DACO's legitimate state interest.

The unchallenged provisions of Regulation 6458 provide consumers with a significant amount of information about the cost of textbooks. As noted earlier, Rule 8 requires private schools to announce the list of books to be used in the next school year, Rule 9 requires them to disclose book prices as well as their agreement with book sellers, Rule 10 requires private schools to inform parents of price changes, and Rule 12 requires them to inform parents of the existence and the application of Regulation 6458.

Rule 11 also provides consumers with information about the cost of private schooling. When schools assign a new textbook edition, Rule 11 requires them to disclose "which [books] have different editions, what the change specifically consists of, and whether it is a significant change or not, as defined by these regulations." R.11. This disclosure requirement provides information about how book costs are determined, which allows parents to determine for themselves which costs of private education they are willing to pay for. The disclosure aspects of Rule 11, therefore, also enable parents "to make an informed decision about the cost of education in private schools."

However, Rule 11's requirement that parents have the option of purchasing the old edition of an assigned textbook is not

relevant, much less narrowly tailored, to the achievement of DACO's goal of providing consumers with information. The purpose of that requirement is not to provide parents with information, it is to save parents money. We therefore find that the option requirement is not narrowly tailored to the state's proffered interest in providing information about the cost of private education.

DACO's second goal is purportedly to protect consumers from "the arbitrary or abusive use of new editions of textbooks that merely contain cosmetic changes." Appellant Br. at 50. If this were in fact a problem, we might have some reason to pause in our judgment. However, the district court noted that

> [t]he record in this case is entirely devoid of any evidence which suggests that the prices of textbooks are excessive, or that textbook publishers' or distributors' pricing, marketing, or other practices are in any way abusive, unfair or arbitrary. Defendant's only argument proffered in support of its allegation of abuse and unfairness is the fact that text book production and distribution is a for-profit industry. This, without more, cannot offend notions of justice in our free-enterprise system. Further, it appears that Regulation 6458 was promulgated without any investigation, hearings, consultation with education experts, evidence, findings, or any other foundation which demonstrated that the textbook publishers' or distributors['] prices or practices are abusive, unfair, or arbitrary. It also appears that DACO had no legitimate basis to conclude that consumers would prospectively become at risk of such exploitation by the textbook industry.

García Padilla, 408 F. Supp. 2d at 77.

On appeal, DACO has not attempted to supplement the information it provided to the district court regarding the need for this regulation.[11]  DACO points only to complaints it received from parents regarding "the excessive costs of textbooks" in private schools.  Appellant Br. at 52-53.  Such complaints are insufficient to establish a legitimate state interest.[12]  "When the Government defends a regulation on speech as a means to redress past harms or to prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured."  Turner Broad. Sys., Inc., 512 U.S. at 664 (internal quotation marks and citation omitted).  DACO must "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  Id.  We cannot conclude that DACO has a legitimate state interest in fixing a problem it has not shown to exist.  Moreover, because there is no evidence of a problem, DACO's proposed solution cannot be narrowly tailored to it.

---

[11]  Nor is it clear that DACO could at this point in the litigation supplement the information it provided to the district court.  See Fed. R. App. P. 10(a).

[12]  It is even difficult to discern what the complaints mean, let alone how Regulation 6458 will address them.  How are these prices excessive?  Excessive in relation to what?  The absence of standards against which we might be able to judge the need for consumer protection legislation in the textbook publishing industry renders DACO's assertion of a substantial state interest mere speculation.

But even if we were to accept the premise that consumers need protection from "the arbitrary or abusive use of textbooks that only contain cosmetic changes," a further problem remains in that Rule 11's option requirement is substantially broader than necessary for DACO to successfully address this interest. The obligations imposed by Rule 11 are not confined to instances in which a new edition of a textbook contains only "cosmetic" changes. As discussed above, many changes considered by DACO not to be significant could qualify as more than cosmetic. For instance, the exclusion of a chapter or section, the addition of one or several sentences to a chapter, section or throughout a book, and the addition of one or several drawings, graphics, tables, or photographs could very well be significant, non-cosmetic changes, depending on their content. Thus, we find that Rule 11's requirement that parents have the option of purchasing the old edition of an assigned textbook does not survive intermediate scrutiny and, as such, violates the schools' constitutional right to academic freedom.

In considering this issue, the district court held that Rule 11 is unconstitutional in its entirety. On this point, we disagree with the district court. As noted above, Rule 11's disclosure requirements survive constitutional scrutiny because they are narrowly tailored to the state's significant interest in providing parents with information about the cost of private

education.  Mindful of our duty to preserve as much of a state law as possible by only severing the problematic portions of the law, we only hold unconstitutional Rule 11's requirement that parents have the option of purchasing the old edition of an assigned textbook.  See Ayotte v. Planned Parenthood of N. New England, 126 S. Ct. 961, 967 (2006).

### B. Law 116

Law 116 provides that "[e]very private school accredited by the General Council of Education that requires the acquisition of school textbooks to [sic] their students shall have the consent of the Association or Council of Parents or of an Assembly of Parents to determine the maximum budget applicable for each school grade for the acquisition of said books required in each school year."[13]  Law 116, Art. III (emphasis added).  Under the statute, the private schools must recommend a budget for textbooks for each grade no later than May 1 of every school year.  Id. at Art. V. "The private school shall illustrate to the Association or Council of Parents . . . the benefits of the recommended budget, and said

---

[13]  "Private school" means "any private educational institution which with or without profit motives, religious or secular, devotes [sic] to the education of preschool, elementary, and intermediate, and/or secondary, or special education, within the territorial limits of the Commonwealth of Puerto Rico."  Law 116, Art. II(b). Law 116 defines "Association or Council of Parents and Teachers" to mean "groups of parents and teachers belonging to a private school authorized to operate in the Commonwealth of Puerto Rico."  Id. at Art. II(a).

association shall <u>approve jointly</u> with the school the same."[14]  <u>Id.</u> (emphasis added).  "The maximum budget approved applicable to each grade for the acquisition of textbooks required in every school year shall be obligatory for each private school."  <u>Id.</u> at Art. VI.

The district court held that Law 116 imposes restraints on the private schools' right to academic freedom under the First Amendment because it restricts their freedom to determine "what shall be taught and how it shall be taught."  <u>See</u> <u>García Padilla</u>, 408 F. Supp. 2d at 79 (quoting <u>Sweezy</u>, 354 U.S. at 263).  We agree.

In requiring private schools to obtain parental consent for the textbook budget, Law 116 significantly limits the schools' ability to choose their own books.  Under the statute, parents have the power to set the private schools' textbook budget by withholding consent until the school agrees to a particular budget. This power to set a maximum budget, in turn, restricts the available choices for textbooks because the total price of all textbooks chosen must be within the approved budget.  In essence, Law 116 forces schools, at the margins, to choose textbooks according to price, rather than content.  This is a significant restriction on private schools' choice of textbooks.

_____

[14]  Parents' participation in the textbook selection approval process is apparently limited by an exception providing that "[n]othing provided by this law authorizes the Association, Council or Assembly of Parents to limit or interfere in any manner in regard to textbooks or books with religious context."  Law 116, Art. V.

-37-

As discussed above, a school's selection of textbooks automatically raises First Amendment concerns because textbook-selection implicates the school's ability to convey a particular message, as well as its ability to convey the message effectively. Thus, a restriction on the school's choice of textbooks -- and in particular one as severe as Law 116 -- interferes with the private school's right to determine for itself "what may be taught" and "how it shall be taught." See Sweezy, 354 U.S. at 263 (internal quotation marks and citation omitted).

Having determined that Law 116 infringes on activity protected under the First Amendment, we must decide the level of scrutiny to apply to the statute. As with Rule 11, the restrictions Law 116 imposes on the private schools' determinations of what to teach and how to teach are restrictions on the private schools' speech. We therefore apply the same standard governing time, place, and manner restrictions discussed above.[15] Again, such

---

[15] Because the private schools did not argue that Law 116 imposed a prior restraint on their academic freedom, we will not analyze it as such. However, we take this opportunity to note that the law is susceptible to such an analysis because it "limits or conditions in advance the exercise of protected First Amendment activity." Fantasy Book Shop, Inc. v. City of Boston, 352 F.2d 1115, 1120 (1st Cir. 1981)(citing Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 552-58 (1976)). "Any system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity." Bantam Books, Inc., 372 U.S. at 70. As a prior restraint, Law 116 would have to contain "narrow, objective, and definite standards" to guide the Association or Council of Parents in their decision to approve or reject a private school's proposed budget. Forsyth County v. Nationalist Movement, 505 U.S. 123, 131 (1992).

restrictions are valid if they (1) are content-neutral; (2) are narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels of communication. Ward, 491 U.S. at 791.

As stated earlier, the test for whether a restriction is content-based is whether the government has adopted it "because of [agreement] or disagreement with the message it conveys." Id. As with Regulation 6458, we see no bias or prejudice toward particular ideas motivating Law 116. There is no evidence to suggest that in enacting Law 116, the Puerto Rico legislature was seeking to promote or frustrate the discussion of any particular message or subject matter. We therefore agree with the district court that this statute is content-neutral. See Ward, 491 U.S. at 791.

The government's principal interest in enacting Law 116 is "to provide the parents of school-age children attending private schools an opportunity to participate in the decision-making process for determining the budget to be spent on textbooks." Appellant Br. at 67. The government justifies this interest "[i]n light of the increasing cost of textbooks that parents have to face each school year, in addition to the school tuition and additional school fees." Id.

Assuming that parental participation in a <u>private</u> school's budgetary decisions is a significant state interest,[16] we agree with the district court that Law 116 is not narrowly tailored to that interest, nor does it leave open ample alternative methods of communication. <u>García-Padilla</u>, 408 F. Supp. 2d at 80. As a preliminary matter, Law 116 is substantially broader than necessary to achieve the state's purported interest. There are many ways in which parents can participate in private schools' budgetary decisions short of having veto power over the budget. The power to veto a budgetary decision is quite a high level of participation -- one that, as we noted earlier, may completely foreclose certain textbook options for the private schools. The requirement of parental consent for the textbook budget thus "burdens substantially more speech and academic freedom than necessary to further [the state's] interest." <u>Id.</u> (citing <u>Turner Broad. Sys., Inc.</u>, 520 U.S. at 185).

Law 116 also does not leave open enough alternative channels of communication to survive intermediate scrutiny. As discussed above, if parents do not approve the schools' proposed budget, which takes into account prices for the school's chosen textbooks, the school will be prevented from using one or more of

---

[16] We make no judgment as to whether this asserted governmental interest is a significant one, except to say that we would require more information about the need for parental participation in school budgetary determinations before so holding. Nevertheless, the district court avoided the question, and so will we.

its chosen textbooks.  Law 116 may effectively <u>preclude</u> a school from using a particular textbook to teach its students.  Thus, Law 116 violates the private schools' right to academic freedom under the First Amendment because it is not narrowly tailored to a significant governmental interest and because it does not leave open ample alternative methods of communication.

Thus, the first factor for the imposition of a permanent injunction is satisfied; the private schools prevail on the merits because Rule 11's option requirement and Law 116 have been shown to violate their right to academic freedom under the First Amendment.

## C. Irreparable Harm

With respect to the harm suffered by the private schools, we note that it has long been held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." <u>Elrod</u> v. <u>Burns</u>, 427 U.S. 347, 373 (1976).  As such, the private schools have satisfied the second factor.

## D. Balance of Equities

The balance of equities in this case also supports the granting of a permanent injunction.  Although the district court did not explicitly compare the harms suffered by the parties to this case, it did note a significant lack of foundation for the proffered harms the government was claiming to remedy with the regulation and the statute.  It cannot be said that such

-41-

conjectural harms outweigh concrete harms to the private schools' constitutionally protected right to academic freedom. On this record, the district court's finding that the harm to the private schools outweighs the harm to the government was proper.

## E. Public Interest

The final consideration is the effect of an injunction on the public interest. Schools have the extraordinary responsibility of educating our youth. While there is no question in our minds that the government has a substantial interest in our system of education, we must acknowledge that the task of educating is made more difficult by government interference with what schools teach and how they teach it. This is particularly true in the case of private educational institutions, in which parents voluntarily choose to enroll their children, at least in part because of the schools' educational philosophies, methodologies, and reputations. In view of the fact that Rule 11's option requirement and Law 116 are far broader than necessary to ensure that parents are informed of and involved in the textbook selection process of private schools, we find that the public is well-served by the district courts' imposition of a permanent injunction in this case.

## IV. Conclusion

For the foregoing reasons, we affirm in part and reverse in part, and remand with instructions for the district court to modify the permanent injunction to enjoin only that portion of Rule

11 of Regulation 6458 that requires schools to give parents the option of purchasing the old edition of an assigned textbook.

**Affirmed in part, Reversed and Remanded in part**. Each party shall bear their own costs.